**United States District Court**
For the Northern District of California

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                   NORTHERN DISTRICT OF CALIFORNIA

7

8   SHAWNDRA STAR BOODE,                      No. C-13-2438 EMC (pr)

9            Petitioner,

10       v.                                   **ORDER DENYING PETITION FOR**
                                             **WRIT OF HABEAS CORPUS**
11  D. K. JOHNSON, Warden,

12           Respondent.

13  _____/

14

15                      I.    __INTRODUCTION__

16          Shawndra Star Boode filed this *pro se* action for a writ of habeas corpus under 28 U.S.C. §

17  2254.  The Court issued an order to show cause why the writ should not be granted as to four claims

18  asserted in the petition.  Respondent has filed an answer and Ms. Boode has filed a traverse.  For the

19  reasons explained below, the petition will be **DENIED**.

20                      II.    __BACKGROUND__

21  A.      __The Crimes__

22          The California Court of Appeal described the events that led to Ms. Boode's conviction for

23  murder and other crimes.

24          The prosecution's theory of the case was that on or about January 17, 2004, appellants shot
            and killed David and Catherine Brooks (Dave and Cathy), with whom they were acquainted,
25          in order to steal approximately $380,000 Dave had recently received in settlement for an
            on-the-job injury.  The victims rented out rooms in their Hayward, California home to help
26          with the rent.  Boode rented a room from the couple.  The victims told many people,
            including Boode, that they were expecting to receive a large sum of money.  Each victim
27          died from a gunshot wound to the head at close range.

28

Two of the prosecution's chief witnesses, Peter Elisary and Jeffery DeTar, each played a role in the murders and testified under grants of immunity.

Peter Elisary knew Rodriguez growing up and knew that he was one of the leaders of a criminal street gang. Elisary met Boode, who was also gang affiliated, in January 2004 while taking drugs with other people. At one time, he had a sexual relationship with her.

Boode told Elisary that Dave and Cathy were receiving a settlement check and that she planned to rob them. Elisary initially refused Boode's invitation to participate in the robbery, but he eventually relented because he had "feelings for her." Boode also asked Rodriguez to participate in the robbery. It was agreed that Rodriguez would be "the muscle" or the "enforcer, to handle everything."

On the night of the murders, Elisary and appellants ingested methamphetamine and discussed the robbery for about an hour. At about "two, three, four in the morning," appellants, accompanied by Elisary, set out to commit the robbery. Elisary drove a white Camaro, which was borrowed from Rodriguez's sister. Boode was armed with a .357 revolver. Elisary parked the Camaro on a side street, out of sight from Dave and Cathy's residence. Appellants both got out of the Camaro and walked toward the residence while Elisary waited in the car.

Ten to fifteen minutes later, appellants "speedwalk[ed]" back to the Camaro and got into the car. Rodriguez appeared "[n]ervous" and Boode appeared "nervous and scared." Elisary drove the Camaro back to Rodriguez's residence. Boode immediately took a shower and Rodriguez showered next.

Boode described the murder to Elisary. Boode said she demanded money from Dave and then "she shot Dave in the back." She then heard a noise in the kitchen, turned and saw Cathy, chased Cathy into the bedroom, and "just shot her" in the "neck or facial area." Later, Rodriguez recounted his version of events to Elisary. Rodriguez stated he "went behind Dave and was choking Dave" with a string or cord. Rodriguez let Dave go, and Dave tried to attack Rodriguez. In an attempt to "make it look like a murder-suicide," Rodriguez took the .357 revolver, cleaned it, and "put it in Cathy's hand and took a spent casing and put it on her hand."

Jeffery DeTar also had a role in the murders and testified at trial under a grant of immunity. During the relevant timeframe, he rented a room from Dave and Cathy in their residence. DeTar testified that Boode was present when Dave discussed the large disability settlement check he was expecting to receive. When the certified letter addressed to Dave arrived on January 14, 2004, DeTar answered the door and signed for it. Dave opened the letter and saw two checks. He then put the checks into a desk drawer. The next day, DeTar drove Dave to a liquor store to cash one check for $15,073. DeTar drove Dave and Cathy to stores to buy clothes, cell phones, and video games.

Boode said she wanted to take the couple's money. DeTar agreed to assist Boode, who he was trying to impress, by alerting her when the couple was home alone. Nonetheless, DeTar warned the couple that Boode and Elisary planned to rob them but they just "blew it off that they wouldn't do it."

On Saturday, January 17, 2004, the couple returned from another shopping spree, and DeTar helped them unload. Thereafter, DeTar called Boode on her cell phone to report that the couple had arrived home and that DeTar planned to leave.

2

Later, DeTar took a telephone call from Boode, who said, "I got that bitch." DeTar also received four to five text messages from Boode. One text message received from Boode stated "777," referencing a jackpot.

When they were face-to-face, Boode reported to DeTar "[t]hat she had had a wrestling match with Cathy in the hallway and that she had gotten her, that she had got her in the bedroom." Boode said that Dave "had been shot also." She explained "[t]hey didn't want anybody to be able to I.D. anybody." Boode claimed they had found a check for $500,000.

After speaking with Boode, DeTar went to Dave and Cathy's residence and knocked on the door, but received no response. DeTar looked through the window of Dave and Cathy's bedroom and saw "blood and stuff on the wall" and a body "in between the dresser and the bed." Later, when the police were conducting an investigation, Boode instructed DeTar to tell police that there was a fight between Cathy and Dave, that Dave hit Cathy, and "it looked like a murder-suicide type thing."

At trial, Rodriguez's sister, Ana Rodriguez, claimed not to remember key portions of her out-of-court statement given to police about the murders. Specifically, Ana testified that she did not recall telling Sergeant Mark Stuart, the lead investigator in the case, that: (1) on the night of the murders, appellants and Elisary left in the white Camaro after Ana loaned them the car; (2) she saw Boode with a black gun; (3) she observed appellants and Elisary return in the white Camaro in the early morning hours of January 17, 2004; (4) after they returned, she observed Boode take her clothes off and put them into a garbage bag; (5) her brother, Rodriguez, told her that he was the lookout, that the victims were awake, that things got out of hand, and that the victims were screaming; (6) Boode showed her a check for over $200,000; and that (7) Rodriguez tore up the check after Ana told him it was no good and that he should get rid of it.

The prosecution presented physical evidence that when the coroner's office moved Dave's body, they found a white telephone cord under his head and a black wool cap under his body. The knit cap yielded a "mixed DNA profile," which meant that the DNA from multiple contributors was found on the cap. Rodriguez could not be excluded as a possible contributor to the DNA profile from the knit cap.

Neither appellant testified at trial. In appellants' defense, they argued that the prosecution witnesses had made numerous conflicting statements about the events in question, and could not be trusted to give reliable testimony. They characterized the prosecution's chief witnesses as longstanding methamphetamine users, whose testimony should be viewed as unreliable, self-interested, and otherwise untrustworthy. To support that theory, the defense presented the expert testimony of Dr. Stephen Pittel, a forensic psychologist, regarding the effects of methamphetamine abuse on a person's memory, perception, and general reliability. Dr. Pittel testified that long-term users of methamphetamine are "very, very unreliable in their memories because of the effect of the drug." He explained "their attention is wandering all over the place and they're constantly seeing and hearing things that other people aren't seeing and hearing."

Resp. Ex. A, California Court of Appeal Opinion ("Cal. Ct. App. Opinion"), ¶. 2-5.

B.   Procedural History

   A jury trial was held for Ms. Boode and Mr. Rodriguez in Alameda County Superior Court in 2010. Following the jury trial, Ms. Boode and Mr. Rodriguez were convicted of two counts of first degree murder. The jury also found true for both defendants the allegations of special circumstances

United States District Court

For the Northern District of California

of murder committed in the course of a robbery and with multiple victims, which elevated both counts to special circumstances murder for sentencing purposes.  The jury also found true the allegations that Ms. Boode personally used a firearm in the commission of the murders, personally and intentionally discharged a firearm and caused great bodily injury on another person.  Ms. Boode was sentenced to 120 years to life plus life in prison without the possibility of parole.

Ms. Boode appealed.  The California Court of Appeal affirmed the judgment of conviction.  *See* Resp. Ex. B. The California Supreme Court denied Ms. Boode's petition for review.  *See id.*

Ms. Boode then filed this action.  Her petition asserts four claims for federal habeas relief.

### III.    JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.    STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

4

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

# V. <u>DISCUSSION</u>

A.   <u>Claim 1: Failure To Grant Requested Continuance</u>

Ms. Boode's first claim concerns the trial courts' refusal to grant her motion for a continuance so that her new attorney could have more time to prepare for trial. In her original federal habeas petition, Ms. Boode identified this as a claim for "ineffective assistance of counsel." In her traverse, she identified this as a claim for a violation of her Sixth Amendment right to effective assistance of counsel and her Fourteenth Amendment right to due process. *Compare* Docket # 1 at 7 *with* Docket # 15 at 3, 9. In the California Supreme Court, however, she had identified the claim as one for a violation of her Fourteenth Amendment right to due process and had conceded that "counsel's eventual performance did not rise to the very high level of constitutionally 'ineffective' counsel set by *Strickland v. Washington*," 466 U.S. 668 (1984). *See* Resp. Ex. B, Petition For Review, pp. 6, 12.

1.   <u>Factual Background</u>

On October 20, 2009, Deborah Levy substituted in as counsel for Ms. Boode.[1] The judge promptly focused on trial preparation, as the codefendant was no longer waiving time on his right to a speedy trial. Ms. Levy stated that she had "a very small part of the discovery" from Ms. Boode.

---

[1] The record does not disclose why Mr. Giller, the attorney who had represented Ms. Boode for more than two years and throughout the lengthy preliminary examination, withdrew from the case that day. Mr. Giller apparently had done substantial work in the case, as evidenced by his lengthy analysis of the case in his May 27, 2009 6-page letter to the district attorney requesting that the death penalty be dropped as a potential penalty in the case. *See* CT 1658-1663.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Resp. Ex. C at RT 2.  Ms. Boode's former counsel (Mr. Giller) promised to deliver three boxes of discovery in four days and counsel for Mr. Rodriguez (Mr. Thews) promised to lend to Ms. Levy two binders containing the police reports the next morning so she could begin preparing her case. Although there were duplicate documents in the files, Mr. Giller estimated he had about three boxes of material, Mr. Thews estimated he had two boxes "and a couple of overflows," and the  prosecutor said he had about six boxes of materials, including one or two boxes of transcripts.  *See* Resp. Ex. C at 1-5.  The court asked how long Ms. Levy thought she would need to get through the materials for a first time, and Ms. Levy estimated it would be three to four weeks.  The court said he wanted to have another hearing in two weeks, on November 4, "and we'll see how far away from a trial we are."  *Id.* at RT 5.  The court made findings that there was good cause to go beyond the sixtieth day of speedy trial time based on the substitution of counsel and the volume of material in the file.[2]

On November 4, 2009, the court again made a finding of good cause to go beyond the statutory speedy trial time limits, set a hearing on December 3 "for informal readiness," and said that there would be a courtroom available for the trial to start on December 7.  *Id.* at RT 6.

On December 3, 2009, Ms. Levy filed a motion for a continuance of the trial for an unstated amount of time because she needed additional time to prepare.  Ms. Levy described the case as having a 500-page police report, 25 preliminary hearing transcripts, approximately 7,000 pages of discovery (including transcripts of statements of at least twenty witnesses), approximately 25 videotapes of statements, and approximately 30 audiotapes of statements.  CT 1448.  In her declaration in support of the motion, Ms. Levy stated that she knew when she was appointed on October 20 that "it was a case with enormous discovery" and that the codefendant was not waiving his speedy trial time.  "In good faith, I told Judge Morrison that I could be ready for a trial on 12/7. At this point that is just impossible."  CT 1447.

On December 7, 2009, to deal with the speedy trial and the continuance issues, the court (with both codefendants' consent) sent the case to "Department 7" (apparently a department in the

---

[2] Ms. Boode does not assert any speedy trial claim.  The speedy trial facts were more of a concern for her codefendant but are mentioned here because they influenced the superior court's responses to Ms. Boode's requests for additional time to prepare.

United States District Court

For the Northern District of California

court in which trials were held) so the parties could stipulate that trial had commenced, with the expectation that pretrial motions and jury selection would start sometime after January 4, 2010. Resp. Ex. C at RT 7-9.  The presiding judge denied Ms. Levy's motion for a continuance.  The presiding judge stated that he was aware this was "a voluminous case" and that Ms. Levy had been "working diligently on it" for a two-month period, and his plan gave Ms. Levy "approximately another four weeks to be ready to begin in earnest."  *Id.* at RT 8.

The parties went to Department 7 later on December 7, 2009, and stipulated that the jury trial had commenced that day.  The trial court stated that the parties would later meet to discuss the juror questionnaire and discuss motions.  The court also stated that on January 4, 2010, the parties would finalize the questionnaire and all the motions should be filed.  The court stated that the parties would argue the motions on January 11, 2010, and the jury panels would report on January 19 and 21.  The court hoped that a jury would be empaneled by January 26 and opening statements could commence on January 26 or 27, 2010.  Ms. Levy said she was "agreeable" with the proposed schedule, although it had been a large file to review.  RT at 4-5.

Thereafter, there were several more court sessions and adjustments to the schedule for jury selection, motions in limine and trial; most of these adjustments were made at Ms. Levy's request because she needed additional time to prepare.  *See* RT at 9-22, 64, 67, 119, 121.  At one session (on December 15, 2009), the court expressed concern about getting a jury if there was a two-week delay between the day on which jurors would be summoned to appear and the day on which voir dire would begin.  *See* RT 17-18.  At another session (on January 4, 2010), the judge mentioned that he wanted to get the proceedings moving because delaying trial would increase the chance that another case would get sent to the department for trial and bump this case.  *See* RT 64.  Also at that January 4, 2010 session, the prosecutor requested that the court set a specific date that trial would start because he needed to subpoena witnesses – "exactly," responded the court – and airline flight arrangements needed to be made for some of the witnesses.  RT 24.  At yet another session (on January 12, 2010), when Ms. Levy again complained about the schedule and that she was "in a mess," the court responded that, back in December, "I told you I would be lenient, but, you know, two months is a little more lenient than what I planned to be."  RT 120-21.  At another session (on

United States District Court

For the Northern District of California

January 26, 2010), when Ms. Levy asked for more time to deal with the jury questionnaires, the court said picking the jury would take time, and "if we keep putting it back, we're going to run into the other time problems," apparently referring to the possibility of losing jurors and Ms. Levy's preplanned vacation scheduled for the end of March.  RT 253.

Eventually, pretrial motions were argued and decided on January 19, 21, 25 and 26, 2010. Voir dire of the jurors occurred on February 1, 2, 8, 9, and 10, 2010.  The jury was sworn in on February 9 and 10, 2010.  On February 22, 2010, the parties made their opening statements to the jury.  The jury returned its verdict on April 1, 2010.  RT 2160.

Ms. Boode filed a motion for new trial on the ground that "[c]ounsel was not able to provide adequate representation due to her inability to have sufficient time to prepare for trial."  CT 1655. The trial court denied the motion for new trial, observing that there had been a lengthy gap between the December 7, 2009 stipulated start of trial and the commencement of testimony on February 2, 2010, and that there had been several breaks during trial.  The trial court explained that the arrangement whereby the parties stipulated that trial began on December 7, 2009, was done to give Ms. Levy more time to prepare, but the judge "didn't mean it would be continued forever."  CT 1668.  "And the Court continued to give more time each time each of you asked for time.  [¶] I think during the time [the prosecutor's] dad was sick, you took a two-week vacation, [and Mr. Rodriguez's attorney] was sick and also had a burglary in his office.  We took time off in between for all of those different things.  [¶] And when we started, everyone seemed prepared.  You didn't seem to have any trouble cross-examining the witnesses, and things moved smoothly. [¶] I know it was a lot of paper, but a lot of it was repetition."  CT 1669.  The trial court also noted that jurors weighed the testimony of all the witnesses, including extensive impeachment evidence.  CT 1669-70.  "Some of the witnesses corroborated each other.  There was other corroborative evidence.  And all of these witnesses were strenuously cross-examined by you, Ms. Levy."  CT 1670.

2.      California Court of Appeal's Decision

On appeal, Ms. Boode contended that the trial court denied Ms. Levy a reasonable opportunity to prepare for trial, and thereby denied her state and federal rights to due process.  Ms. Levy was a sole practitioner with one investigator.  Ms. Boode argued that the trial judge "'refused

**United States District Court**
For the Northern District of California

1   to grant any outright continuances of trial, despite three separate requests for such continuances;

2   instead, she kept adjusting the calendar for certain deadlines, and thereby parceled out to [defense

3   counsel] in dribs and drabs, a few more days here and there for trial preparation.'" Cal. Ct. App.

4   Opinion at 7.  She urged that "'the trial court was overly concerned with keeping this trial on a

5   preconceived schedule, without regard to whether such rigid adherence to judicial economy and

6   expediency obviated appellant's due process right to a fair trial, or her attorney's ability to present

7   an effective defense.'" *Id.*

8       The California Court of Appeal rejected Ms. Boode's challenges, focusing mostly on state

9   law precedents.  That court determined that the denial of a continuance was "'not an arbitrary

10  insistence on expeditiousness, but rather a reasoned assessment of the need for delaying the trial in

11  light of the potential problems such delay might cause.'"  Cal. Ct. App. Opinion at 7 (quoting *People*

12  *v. Fuiava*, 53 Cal. 4th 622, 651 (Cal. 2012).  The California Court of Appeal focused on the tension

13  between Mr. Rodriguez's assertion of his speedy trial rights and Ms. Boode's desire to further delay

14  the trial.

15       Because codefendant Rodriguez had not waived his speedy trial rights, the trial court was in
a difficult quandary.  Boode's counsel successfully asked for continuances to adequately
16  investigate and prepare, often citing the large amount of discovery to be studied.  In ruling on
the continuance requests, the trial court was presented with two competing and conflicting
constitutional interests.  In addition to providing the right to a speedy trial, the Sixth
17  Amendment provides a criminal defendant with the right to assistance of counsel.  (U.S.
Const., 6th Amend.; *Gideon v. Wainwright* (1963) 372 U.S. 335, 344.)  "It has long been
18  recognized that the right to counsel is the right to the effective assistance of counsel.
[Citations.]"  (*McMann v. Richardson* (1970) 397 U.S. 759, 771, fn. 14.) The trial court was
19  aware of the nature of these conflicting rights and, although it granted counsel's continuance
requests, it did so with continuances of a shorter duration than counsel sought.FN3
20

21       FN3. Boode claims "severing the parties would have solved that problem." (Fn.
omitted.) However, we note that on appeal, appellant does not challenge the trial
22      court's denial of her motion for severance of trial from her codefendant.

23       Moreover, in addition to showing error, Boode must also demonstrate prejudice.  Boode does
not identify any particular meritorious defense strategies or evidentiary objections that
24  should have been pursued, but were not, as a result of the denial of the continuance.  She
makes clear that she is "not arguing on direct appeal that appellant's trial counsel was
25  'ineffective.' This appellate challenge is solely based on court error in refusing to grant that
attorney's requested continuances, which were necessary for her to prepare a defense."
26  (Boldface omitted.) Consequently, she merely suggests some undefined prejudice should be
"presumed," which is inconsistent with binding precedent requiring that appellant show
27  actual prejudice.  (See *People v. Zapien* (1993) 4 Cal.4th 929, 972–973 [finding no prejudice
from denial of a continuance where there was no reasonable basis to conclude from the
28  defendant's showing that the trial court's ruling led to a less favorable result for the

United States District Court

For the Northern District of California

defendant]; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 1039–1040.)  For the foregoing reasons, we conclude Boode has failed to establish that the trial court abused its discretion or violated her constitutional rights by denying her motions for a continuance.

Cal. Ct. App. Opinion at 7-8.

        3.    <u>Analysis of Federal Constitutional Claims</u>

          a.    <u>Due Process Claim</u>

"The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.  There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) (citations omitted); *see also Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) ("broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel").[3]  Even if a continuance has been denied improperly, habeas relief is not available unless there is a showing of actual prejudice to

---

[3] In *Morris*, the requested continuance implicated the Sixth Amendment right to counsel, but it is a choice-of-counsel case rather than an ineffective-assistance-of-counsel case.  In *Morris*, the original public defender who had represented the defendant was taken ill and another public defender was assigned to represent the defendant shortly before trial was to start.  At the beginning of trial, the new public defender was ready to go, but the defendant asked for a continuance to give the new public defender more time to prepare.  The trial court denied the motion.  By the third day of trial, the defendant claimed that he was unrepresented at trial because his only true attorney was his original public defender who had taken ill.   The trial court treated the argument as a renewed request for a continuance and denied it.  On appeal from the denial of a petition for writ of habeas corpus, the Ninth Circuit announced that the Sixth Amendment right to counsel included a right to a "'meaningful attorney-client relationship,'" and that the trial court had failed to give it sufficient weight in refusing to continue the trial to give the original public defender time to heal and return to representing the defendant. *See Morris*, 461 U.S. at 10-11.  The U.S. Supreme Court determined that the trial court's denial of the requested continuance at the outset of a trial "was far from an abuse of discretion" in light of the replacement public defender's preparation and announced readiness to proceed, *id.* at 12, and that the trial court's denial of the midtrial motion for a continuance to have the original public defender return to representing defendant "was abundantly justified," *id.* at 13.  *Morris* is best known for its strong rejection of the Ninth Circuit's "novel idea that the Sixth Amendment guarantees an accused a 'meaningful attorney-client relationship.'" *Id.* at 14.

United States District Court

For the Northern District of California

1   petitioner's defense resulting from the refusal to grant a continuance.  *See Gallego v. McDaniel*, 124

2   F.3d 1065, 1072 (9th Cir. 1997).

3          *Ungar* and *Morris* provide the "clearly established Federal law" for purposes of applying §

4   2254(d)(1) to Ms. Boode's claim.  "[E]valuating whether a rule application was unreasonable

5   requires considering the rule's specificity.  The more general the rule, the more leeway courts have

6   in reaching outcomes in case-by-case determinations."  *Yarborough v. Alvarado*, 541 U.S. 652, 664

7   (2004); *see, e.g., Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("The *Strickland* standard is a

8   general one, so the range of reasonable applications is substantial").  The rules stated in *Ungar* and

9   *Morris* are general rules.  Thus, the § 2254(d) analysis must be done with the understanding that the

10  California court has more leeway in deciding whether the denial of the continuance violated Ms.

11  Boode's federal constitutional rights.

12         The California Court of Appeal's rejection of Ms. Boode's due process claim was not

13  contrary to or an unreasonable application of the very general rules in *Ungar* and *Morris*.  Ms.

14  Boode's case was not a case of a judge with a "myopic insistence upon expeditiousness in the face

15  of a justifiable request for delay."  *Ungar*, 376 U.S. at 589.  The superior court denied Ms. Boode's

16  request for a continuance, but made several adjustments to the schedule mostly at Ms. Levy's

17  request.  As a result of the scheduling and adjustment decisions, Ms. Levy had more than four

18  months to prepare the defense before she gave her opening statement.  Even with the allegedly

19  voluminous materials – perhaps 7,000 pages of documents and some tapes – the state appellate court

20  could have reasonably concluded that four months was sufficient time to prepare a defense.  Ms.

21  Levy never provided any more specific reason for a continuance than that she was having difficulty

22  reviewing the substantial documents, e.g., there was no missing witness or elusive expert being

23  sought.  When Ms. Levy first took the case in October 2009, she knew that the documents were

24  voluminous and said then she thought she could make at least a first read-through of the materials in

25  3-4 weeks.  Ms. Boode does not explain in any detail why Ms. Levy was unable to be prepared for a

26  trial in which testimony did not start until four months after she was appointed.  Ms. Boode also

27  does not demonstrate that the work done by Ms. Levy's predecessor was unusable by Ms. Levy.

28

1   While she may have entered a case with thousands of pages of documents, she also entered a case in

2   which her client had been represented by another attorney for at least two years.

3        Ms. Boode faults the trial court for giving extensions of time in "dribs and drabs," but that

4   argument is unpersuasive.  First, the argument ignores that, before mid-January 2010, Ms. Levy had

5   two large blocks of time to prepare: she had almost seven weeks (i.e., from October 20, 2009

6   through December 7, 2009) from the day she was appointed until the intended start of trial on

7   December 7; and she had another six weeks (i.e., from December 7, 2009 through January 19, 2010)

8   from the day of the stipulated start of trial until the jury was scheduled to report for duty on January

9   19, 2010.  Thereafter, the court pushed back various dates mostly to accommodate Ms. Levy's

10  claimed need to do further preparation; even if those were short extensions, Ms. Levy could have

11  done more work with each short extension of time she received.  Also, the court's normal trial

12  schedule allowed for further preparation during the trial, as the presentation of evidence to the jury

13  was anticipated to take only five hours per day on any trial day.  *See* RT 272 (jury will be told the

14  normal schedule for trial is from 9:30 a.m. to 12:00 p.m. and 2:00 p.m. to 4:30 p.m. Monday through

15  Thursday of each week, with Fridays and several additional days off).

16        The California Court of Appeal's rejection of Ms. Boode's due process claim was not an

17  unreasonable application of *Ungar* or *Morris*.  Ms. Levy had entered the case rather late and asked

18  for a continuance rather quickly, so it cannot be said she was just trying to avoid trial at the last

19  minute.  However, unlike the usual situation, there was a codefendant here asserting his

20  constitutional right to a speedy trial.  That codefendant's assertion of his constitutional right could

21  not be ignored as the trial court considered Ms. Boode's request for a continuance.  A severance did

22  not appear a good option, even if requested, because there is a state statutory policy favoring joint

23  trials of jointly charged codefendants, *see* Cal. Penal Code § 1098, and these two codefendants were

24  thought to have acted very much together in the crimes, e.g., Ms. Boode shot one victim when the

25  victim broke free from Mr. Rodriguez's efforts to strangle him.  If separate trials were held, there

26  would have been a duplication of a great deal of effort.  *See Morris*, 461 U.S. at 15 ("The spectacle

27  of repeated trials to establish the truth about a single criminal episode inevitably places burdens on

28  the system in terms of witnesses, records, and fading memories, to say nothing of misusing judicial

United States District Court

For the Northern District of California

1   resources").  The trial court had carefully considered the  competing interests – of Ms. Boode's

2   counsel's desire to obtain additional time to prepare for trial and of Mr. Rodriguez's speedy trial

3   rights – when it denied the requested continuance.  The state appellate court could reasonably have

4   concluded that this was not the sort of "myopic insistence upon expeditiousness in the face of a

5   justifiable request for delay" that *Ungar* prohibits.  The state appellate court also reasonably could

6   have concluded that the trial court's denial of the motion for a continuance was permissible under

7   *Morris*, which specifically noted the need to accord trial judges "a great deal of latitude in

8   scheduling trials.  *Morris*, 461 U.S. at 11.  Not only was there the speedy trial issue, the trial court

9   also was concerned that repeated delays after jurors were first summoned would result in the loss of

10  some jurors, and the prosecutor needed a date certain for the trial's start for purposes of lining up his

11  witnesses.  *See id.*  ("Not the least of [trial judges'] problems is that of assembling the witnesses,

12  lawyers, and jurors at the same place at the same time, and this burden counsels against continuances

13  except for compelling reasons.")  The California Court of Appeal's rejection of Ms. Boode's due

14  process claim was not an unreasonable application of or contrary to clearly established Supreme

15  Court precedent.

16          The biggest problem for Ms. Boode is her complete failure to show any prejudice resulting

17  from the denial of the continuance, even if the denial of the continuance had amounted to

18  constitutional error.  If constitutional error is found, habeas relief is warranted only if the error had a

19  "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Penry v. Johnson*,

20  532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).  *See Gallego*

21  *v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997) (to obtain habeas relief, actual prejudice must be

22  shown from the refusal to grant a continuance).  In denying Ms. Boode's motion for new trial, the

23  trial judge observed that all parties appeared to be well-prepared; the witnesses were vigorously

24  cross-examined; and the jurors heard all of the testimony, including testimony from allegedly

25  unreliable witnesses (including those witnesses' history, criminal conduct, drug use, grants of

26  immunity, and motives) but nonetheless believed them.  CT 1669.  The fact that the jury

27  deliberations took only two hours after several weeks of testimony also strongly indicates that a

28  continuance for Ms. Levy to further prepare would not have made a difference for Ms. Boode.

**United States District Court**
For the Northern District of California

1    *United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007) ("'Longer jury deliberations weigh against

2    a finding of harmless error because lengthy deliberations suggest a difficult case.'"); *see, e.g., id.* at

3    846 (jury's deliberation for 2.5 hours on illegal reentry case suggested any error in allowing

4    testimony or commentary on defendant's post-arrest silence was harmless); *United States v.*

5    *Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (jury deliberation for 4 days supported

6    inference that impermissible evidence affected deliberations).  Like the state appellate court, this

7    Court will not presume prejudice when none has been identified by the petitioner.

8                          b.      The Ineffective Assistance Of Counsel Claim

9            As mentioned at the outset of the discussion, Ms. Boode identified her denial-of-a-

10   continuance claim as a claim for "ineffective assistance of counsel" in her original federal habeas

11   petition, and identified it as a claim for a violation of her Sixth Amendment right to effective

12   assistance of counsel and her Fourteenth Amendment right to due process in her traverse.  *Compare*

13   Docket # 1 at 7 *with* Docket # 15 at 3, 9.  In the California Supreme Court, she had conceded that

14   counsel's performance "did not rise to the very high level of constitutionally 'ineffective' counsel set

15   by *Strickland.*"  Petition For Review at 6, 12.

16          Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings

17   either the fact or length of their confinement are required first to exhaust state judicial remedies,

18   either on direct appeal or through collateral proceedings, by presenting the highest state court

19   available with a fair opportunity to rule on the merits of each and every claim they seek to raise in

20   federal court.  *See* 28 U.S.C. § 2254(b), (c).  A district court may deny, but not grant, relief on a

21   habeas petition that presents an unexhausted claim.  *See* 28 U.S.C. § 2254(b)(1).  The district court

22   can deny an unexhausted claim "only when it is perfectly clear that the applicant does not raise even

23   a colorable federal claim."  *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005).

24          Ms. Boode's claim that she was denied her Sixth Amendment right to effective assistance of

25   counsel as a result of the denial of a continuance is unexhausted because she never fairly presented

26   that claim to the California Supreme Court.  Moreover, this court may deny relief on this

27   unexhausted claim because "it is perfectly clear," *id.*, that Ms. Boode does not raise even a colorable

28   Sixth Amendment claim.  In order to prevail on a claim that one has been denied her Sixth

1  Amendment right to effective assistance of counsel, a petitioner must establish two things.  First, she

2  must demonstrate that counsel's performance was deficient and fell below an "objective standard of

3  reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-

4  88 (1984).  Second, she must establish that she was prejudiced by counsel's deficient performance,

5  i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

6  the proceeding would have been different." *Id.* at 694.  Ms. Boode has made no showing on either

7  *Strickland* prong.  Her unexhausted ineffective assistance of counsel claim is patently meritless and

8  therefore is denied.

9      Ms. Boode is not entitled to the writ on her claims that the denial of a continuance violated

10  her Sixth and Fourteenth Amendment rights.

11  B.   Juror No. 8

12      Ms. Boode claims that she was deprived of her federal constitutional right to an impartial

13  jury when the trial court refused to dismiss a juror who reported observing Ms. Boode's codefendant

14  glare at and mouth words to a witness who was testifying against the defendants.

15      1.   State Court Proceedings

16  During the trial, the court received a written message from Juror No. 8 saying that she had
   seen something frightening and that she wanted to talk about it without calling attention to

17  herself.  When Juror No. 8 was questioned by the court outside the presence of the jury, the
   juror said she had observed Rodriguez move his mouth to communicate with Elisary, one of

18  the prosecution witnesses who had been testifying, in what Juror No. 8 perceived to be a
   threatening and intimidating manner.  Juror No. 8 expressed fear from seeing Rodriguez give

19  Elisary a "scary stare" and from "moving his lips and talking, saying something, just barely
   moving his lips."  FN4  She stated she was "frightened" and the court acknowledged that she

20  was crying.  The trial court established that Juror No. 8 had not discussed her observations or
   fears with any other juror, and the court instructed her not to do so.  The trial court moved to

21  allay any fear by stating "we'll just watch very carefully" and indicating the deputies would
   be instructed "to make sure that the jurors are protected."

22
        FN4. It is likely that the event described by Juror No. 8 actually occurred because the
23      trial judge indicated that a member of his courtroom staff had also reported that he
        thought he saw "Mr. Rodriguez mouthing something to Mr. Elisary...."
24
   When asked if she would hold Rodriguez's actions against him, Juror No. 8 replied, "To be
25  honest, I don't know."  When questioned whether she still could be fair and impartial, she
   replied, "I think I could decide the facts, but I would be scared if we convicted him."  When
26  asked if she could vote "not guilty" if the People did not prove their case, she replied, "I
   think so," which she then defined as "in between" an affirmative and negative answer to that
27  question.  In the end, she nodded her head up and down and said, "I think so" in answer to
   the court's question whether she could "keep an open mind" despite what she had observed.
28  The court denied appellants' motion to excuse Juror No. 8 for bias.

United States District Court

For the Northern District of California

1  Cal. Ct. App. Opinion at 9-10.

2          Ms. Boode's motion for new trial unsuccessfully asserted that Juror No. 8 should have been

3  dismissed.  The trial court observed that, after the court and counsel had talked to Juror No. 8 in

4  chambers, everyone "appeared to be satisfied that she could continue to be a fair and impartial juror.

5  I know that you had some concerns about her, but once we spoke with her, the concerns were

6  alleviated."  CT 1669-70.

7          Ms. Boode asserted on appeal that the failure to dismiss  Juror No. 8 due to her exposure to

8  events outside the trial evidence violated Ms. Boode's Sixth Amendment and state law rights to an

9  impartial jury.  The California Court of Appeal discussed only state law in rejecting Ms. Boode's

10  claims.  Under state law, a juror who is "unable to perform his or her duty" may be discharged and

11  replaced by an alternate juror.  Cal. Ct. App. Opinion at 10 (quoting Cal. Penal Code § 1089).  Juror

12  No. 8's inability to serve as a juror would not be presumed, and was not shown as a "demonstrable

13  reality," as required for dismissal under state law.  *Id.*  "Despite her safety concerns, her responses to

14  the court's questions reflected that Juror No. 8 intended to do her best to give appellants a fair trial.

15  '[A] juror like this one, who candidly states [her] preconceptions and expresses concerns about

16  them, but also indicates a determination to be impartial, may be preferable to one who categorically

17  denies any prejudgment but may be disingenuous in doing so.  A reviewing court must allow the

18  trial court to make this sort of determination.  The trial court is present and able to observe the juror

19  itself.  It can judge the person's sincerity and actual state of mind far more reliably than an appellate

20  court reviewing only a cold transcript.'"  Cal. Ct. Ap. Opinion at 10-11 (citations omitted; second

21  alteration added).

22          The California Court of Appeal also rejected Boode's argument that the trial court should

23  have allowed defense counsel to make follow-up inquiries of Juror No. 8 later in the trial to

24  determine whether she was still fearful.  "[T]here is nothing (apart from rank speculation) to indicate

25  that Juror No. 8's impartiality was tainted by her earlier experience, or that she was unable to

26  disregard Rodriguez's courtroom conduct and render a verdict based on the evidence.  'One can

27  always argue further questioning might yield different and more favorable results, but that is a

28

United States District Court

For the Northern District of California

1    matter committed to the discretion of the trial court.'"  Cal. Ct. App. Opinion at 11 (citation

2    omitted).

3         2.    Analysis of Sixth Amendment Claims

4              a.    Juror Misconduct Claim

5                   i.    Clearly Established Law

6         The Sixth Amendment guarantees the criminally accused the right to a fair trial by a panel of

7    impartial jurors.  U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  The jury's

8    verdict "'must be based upon the evidence developed at the trial.'"  *Turner v. Louisiana*, 379 U.S.

9    466, 472 (1965).  "In the constitutional sense, trial by jury in a criminal case necessarily implies at

10   the very least that the 'evidence developed' against a defendant shall come from the witness stand in

11   a public courtroom where there is full judicial protection of the defendant's right of confrontation, of

12   cross-examination, and of counsel."  *Id.* at 472-73.  Juror exposure to extraneous influences is

13   considered juror misconduct, even when the exposure is not the juror's fault.

14        The "clearly established Federal law, as determined by the Supreme Court of the United

15   States," 28 U.S.C. § 2254(d), regarding juror misconduct based on extrinsic influences comes from

16   three Supreme Court cases:  *Mattox v. United States*, 146 U.S. 140 (1892), *Remmer v. United States*,

17   347 U.S. 227 (1954), and *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  In *Mattox*, the Supreme Court

18   articulated the rule: "Private communications, possibly prejudicial, between jurors and third persons,

19   or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least

20   unless their harmlessness is made to appear."  *Mattox*, 146 U.S. at 150.  *Remmer* later restated the

21   rule and elaborated on the presumption of prejudice:

22        In a criminal case, any private communication, contact, or tampering directly or indirectly,
         with a juror during a trial about the matter pending before the jury is, for obvious reasons,
23        deemed presumptively prejudicial, if not made in pursuance of known rules of the court and
         the instructions and directions of the court made during the trial, with full knowledge of the
24        parties. The presumption is not conclusive, but the burden rests heavily upon the
         Government to establish, after notice to and hearing of the defendant, that such contact with
25        the juror was harmless to the defendant.

26   *Remmer*, 347 U.S. at 229.

27        The *Smith* case focused on the procedural steps the trial court must take when potential juror

28   misconduct arises.  The Constitution "does not require a new trial every time a juror has been placed

17

1  in a potentially compromising situation." *Smith*, 455 U.S. at 217.  "Due process means a jury

2  capable and willing to decide the case solely on the evidence before it, and a trial judge ever

3  watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when

4  they happen." *Id.*  The trial judge can "'determine the circumstances, the impact thereof upon the

5  juror, and whether or not [they were] prejudicial, in a *hearing* with all interested parties permitted to

6  participate.'" *Id.* (quoting *Remmer*, 347 U.S. at 230 (1954)).  The trial judge may ascertain the

7  impartiality of the juror "by relying solely upon the testimony of the juror in question." *Id.* at 215;

8  *see also id.* at 217 n.7 (rejecting the argument that the evidence from the juror in question "is

9  inherently suspect").

10                 ii.     State Courts Unreasonably Applied *Mattox* and *Remmer*

11       In Ms. Boode's case, the trial court took steps to inquire into the reported problem and held a

12  hearing similar to that contemplated in the Supreme Court cases of *Remmer* and *Smith*, i.e., a hearing

13  with counsel for the parties present at which the trial judge "determine[d] the circumstances, the

14  impact thereof upon the juror, and whether or not [they were] prejudicial." *Smith*, 455 U.S. at 217;

15  *Remmer*, 347 U.S. at 230.  The trial court also allowed counsel to question Juror No. 8 at the

16  hearing, as contemplated by *Remmer* and *Smith*.  *See* RT 1105.[4]

17       Although the trial court held a hearing similar to that contemplated in *Remmer* and *Smith*, the

18  hearing in Ms. Boode's case was constitutionally deficient in that the *Remmer* presumption played

19  no role.  There simply is no indication that the trial court considered Juror No. 8's observation of

20  Mr. Rodriguez's menacing behavior toward the witness to be "presumptively prejudicial." *Remmer*,

21  347 U.S. at 229.  Nor is there any indication that the trial court placed any burden (let alone a heavy

22  one) "upon the Government to establish" that the incident "was harmless" to Ms. Boode. *Id.*  The

23

24

25       [4] The trial court's refusal to reopen the inquiry later in the trial to let defense counsel pose

26  further questions to Juror No. 8 was not unreasonable as nothing further had occurred.  As the
California Court of Appeal stated, the requests to further question the juror later in the trial were

27  based on nothing more than "rank speculation" that Juror No. 8's "impartiality was tainted by her
earlier experience, or that she was unable to disregard Rodriguez's courtroom conduct and render a

28  verdict based on the evidence." Cal. Ct. App. Opinion at 11.  Neither *Remmer* nor any other
Supreme Court case required *repeated* inquiries into one incident of potential juror misconduct.

United States District Court

For the Northern District of California

1   Government did not meet its burden of overcoming the presumption that Juror No. 8 was no longer

2   impartial.

3        The California Court of Appeal repeated the trial court's error. The state law test identified

4   by the California Court of Appeal did not conform to *Remmer* because, rather than place a heavy

5   burden on the Government to show the incident to be harmless, that test put the burden on the

6   defendants to show Juror No. 8's inability to serve as a juror "as a demonstrable reality." Cal. Ct.

7   App. Opinion at 10. Although the California Court of Appeal discussed only the state law claim,

8   nothing in the opinion suggests that the state appellate court approached the federal constitutional

9   claim differently. The state appellate court's rejection of the claim leads to the conclusion that it

10   unreasonably failed to apply the *Remmer* presumption, because no reasonable jurist could review the

11   transcript of the Juror No. 8 hearing and conclude that the prosecution had rebutted the presumption

12   of prejudice. The final few questions of Juror No. 8 at the hearing showed a juror who was uncertain

13   as to whether she could do her juror functions, and a hearing at which the only evidence is a hesitant,

14   scared and uncertain juror is not one at which the prosecution has overcome the *Remmer*

15   presumption of prejudice.

16        Due to the failure of the trial court and the California Court of Appeal to apply the

17   *Remmer* presumption, the federal habeas court need not defer to the state court's apparent finding

18   that Juror No. 8's impartiality was unaffected by her observation of Mr. Rodriguez's conduct.

19   "AEDPA's presumption of correctness does not apply to state court findings arrived at through the

20   use of erroneous legal standards." *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 698

21   (9th Cir. 2004). When, as here, the trial court and state appellate court have failed to evaluate the

22   juror misconduct claim without presuming prejudice and without placing the burden on the

23   Government to overcome that presumption, the federal habeas court reviews the matter "*de novo*

24   whether the government showed that there was no reasonable possibility that the communication

25   influenced the verdict." *Id.*

26                iii.    A Constitutional Error Occurred

27        In applying *de novo* review, the Court notes this juror misconduct claim is somewhat unusual

28   in that the juror's reaction appears quite out of proportion to the event she observed. But the event

United States District Court

For the Northern District of California

1   did amount to misconduct under the Supreme Court's definition, and did trigger the *Remmer*

2   presumption. Juror No. 8's observation of Mr. Rodriguez's menacing behavior toward a witness

3   was extrinsic evidence because it did not "come from the witness stand." *Turner*, 379 U.S. at 473.

4   *See United States v. Simtob*, 485 F.3d 1058, 1064-65 (9th Cir. 2007) (defendant's alleged act of

5   "eye-balling" a juror that made the juror feel "threatened" raised a presumption of prejudice

6   "because 'even indirect coercive contacts that could affect the peace of mind of the jurors give rise

7   to the *Remmer* presumption'"); *United States v. Schuler*, 813 F.2d 978, 981 (9th Cir. 1987)

8   (prosecutor's comment on nontestifying defendant's courtroom laughter during presentation of

9   evidence of his threatening comments impinged on defendant's Fifth Amendment right not to be

10  convicted except on the basis of evidence adduced at trial). *But see Schuler*, 813 F.2d at 983 (Hall,

11  J., dissenting) ("The principle that a defendant's courtroom demeanor is evidence is well-settled").

12  Juror No. 8's observation of Mr. Rodriguez's conduct exposed her to an extrinsic influence.

13  Therefore, the presumption of prejudice arose with regard to Juror No. 8 under *Remmer*, 347 U.S. at

14  228, because that presumption arises when the juror is exposed to an extrinsic influence. While this

15  case is different from the more typical context of *e.g.*, a telephone call from an unnamed person

16  telling a juror that an acquittal could be profitable for the juror in *Remmer*, the ongoing

17  fraternization between jurors and the two deputies who were both key witnesses and the caretakers

18  of the jurors during the three-day trial in *Turner*, or the juror contacting the prosecutor's office

19  during trial to apply for a job as an investigator in *Smith*, the evidence here which frightened Juror

20  No. 8 is extrinsic evidence.[5]

21

22      [5] Neither the trial court nor the California Court of Appeal found that there was not an
    extrinsic influence on Juror No. 8, and the parties do not argue that there was not an extrinsic
23  influence.

24      The Court notes there is some question as to whether a defendant's in-court behavior actually
    can amount to an extrinsic influence on a juror. *See Wilson v. United States*, 505 F. App'x 884, 886
25  (11th Cir. 2013) ("We have yet to consider in a published opinion whether a defendant's alleged
    staring at the jury constituted an 'extraneous' or 'extrinsic' contact such that the district court was
26  required to conduct further inquiry [under *Remmer*, 347 U.S. 227], and we note that our sister
    circuits are split on the issue") The U.S. Supreme Court has quoted with approval a jury instruction
27  advising the jury to consider the defendant's "'demeanor and conduct upon the witness stand and
    during the trial,'" although that case was different from the present one in that the defendant had
28  testified. *See Reagan v. United States*, 157 U.S. 301, 308-09 (1895). Several other lower courts
    have considered a defendant's in-court behavior to be something that a jury may consider. *See, e.g.,*

United States District Court

For the Northern District of California

Due to the existence of juror misconduct – in the sense that Juror No. 8 was exposed to extrinsic evidence – the trial court was required to consider the impact of the exposure to extrinsic evidence on Juror No. 8 in order to determine whether she had to be removed from the jury.  Juror No. 8's statements were equivocal and hesitant throughout that hearing.  A review of the  transcript leaves the reader with a feeling that maybe Juror No. 8 could decide the case properly and maybe she could not decide it properly.  The final few questions and answers at the hearing show Juror No. 8's lingering uncertainty as to whether she could do her juror functions.

THE COURT: Is there anything about that that would cause you to hold it against Mr. Rodriguez in the final analysis in this case?

[JUROR NO. 8]: I don't know.  To be honest, I don't know.

[THE PROSECUTOR]: And do you understand –

[JUROR NO. 8]: It might be hard.

\* \* \*

[THE PROSECUTOR]: Do you think you could still be fair and impartial in this case sitting as a juror and decide the facts and decide the facts based upon the evidence?

[JUROR NO. 8]: I think I could decide the facts, but I would be scared if we convicted him.  Just I know it's probably crazy.

THE COURT: So as a result of that, you would, if [the prosecutor] proved the case beyond a reasonable doubt, you would vote not guilty, even if he proved the case, just because of that?

[JUROR NO. 8]: I don't think I could vote not guilty.  I would just go on being scared after that.

---

*United States v. Gatto*, 995 F.2d 449, 453-56 (1993) (prosecutor's comment on nontestifying defendant's menacing look at testifying witness did not violate his constitutional right "to be judged solely on the basis of evidence adduced at trial" where witness testified that he saw those menacing looks); *Maiello v. Edwards*, 1998 WL 230956 (S.D. N.Y. 1998) (habeas relief not warranted for prosecutor's comment on nontestifying defendant's demeanor in the courtroom because it was not a testimonial communication and the behavior was not compelled); *United States v. Calabrese*, 2008 WL 1722137 (N.D. Ill. 2008) (during closing argument, juror observed one of several defendants utter a threat to a prosecutor; trial court finds that the threat is not extraneous evidence and "[i]t is axiomatic that there is nothing improper about a jury observing a defendant's courtroom demeanor during trial"); *Waller v. United States*, 179 F. 810, 812 (8th Cir. 1910) ("The demeanor of the defendant is not only proper evidence, but it is impossible to prevent the jury from observing and being influenced by it.").  *See generally* 2 J. Wigmore, *Evidence* § 274 (J. Chadbourn rev. ed. 1979) ("the attempt to force a jury to become mentally blind to the behavior of the accused sitting before them involves both an impossibility in practice and a fiction in theory").

United States District Court

For the Northern District of California

| | |
|---|---|
| THE COURT: | But if [the prosecutor] did not prove the case beyond a reasonable doubt, could you vote not guilty. |
| [JUROR No. 8]: | I think so. |
| [DEFENSE COUNSEL]: | I'm sorry, Your Honor.  I couldn't tell if that was affirmative or negative? |
| [JUROR No. 8]: | I think it was, it was in between. |

RT 1107-08.  At that point, the state of the evidence was that Juror No. 8 "was in between" as to whether she could vote not guilty if the prosecutor did not prove his case beyond a reasonable doubt. The trial judge did note that there was more evidence to be presented, and asked whether Juror No. 8 could, "as [she] promised before," "keep an open mind, and for both sides," to which Juror No. 8 nodded her head up and down and said, "I think so."  RT 1109.  Her uncertainty as to her ability to serve impartially was evident.

Moreover, Juror No. 8 was frightened by the event and, when asked if her observation would interfere with her ability to continue to be fair and impartial as a juror in this case, she said, "I don't know.  I don't know," and was crying.  RT 1104.  As the court and prosecutor suggested at the hearing, some of the juror's distress may have been as much due to the testimony at trial about the murders, gangs, and threats against witnesses as Mr. Rodriguez's in-court behavior.  *See* RT 1104, 1113.  Nonetheless, she attributed her fear to Mr. Rodriguez's menacing look.  Juror No. 8 stated that Mr. Rodriguez's staring at and mouthing words to witness Elisary "scared" her, and that she felt "sort of exposed where I'm sitting because he often looks over, and I just feel vulnerable."  RT 1103; *see also* RT 1104 ("I'm just frightened.")  When asked if she was "concerned [she] may be hurt or injured because of what [she] observed in the courtroom?" Juror No. 8 responded,  "[a] little. A little bit.  Just because of all the people there, you know, I get nervous.  Out there, in the audience. And, you know, it's they all have friends and, you know, it's just kind of a little paranoia, looking over my shoulder.  I mean, we don't have escorts to our cars or anything."  RT 1105.  Juror No. 8 also had wanted to submit a question for the witness but "was afraid to" because "[i]t would have sounded to them as if I were favoring [this witness's] testimony in some way."  RT 1108. Although it was the codefendant's behavior that frightened Juror No. 8, the fear affected Juror No. 8's view of Ms. Boode also.  As Ms. Boode points out, Juror No. 8 grouped the codefendants together in some

United States District Court

For the Northern District of California

of her comments: Juror No. 8 worried because "**they** all have friends," RT 1105; Juror No. 8 did not want "the **defendants**" to find out what she was saying, RT 1106; and Juror No. 8 worried that, had she passed a question for Elisary to the bailiff as she wanted to, "[i]t would have sounded **to them** as if [she] were favoring [Elisary's] testimony in some way," RT 1108. Docket # 15 at 10 (emphasis added).

The trial judge's comments – undoubtedly meant to assuage Juror No. 8's fears – may have reinforced Juror No. 8's belief that the defendants were people to be feared. The trial judge started to suggest that Juror No. 8 could have an escort if she was concerned. RT 1105. She also assured Juror No. 8 that "[w]e're going to watch very carefully and tell the deputies to make sure that the jurors are protected," and that she (the judge) would be the most likely target if the defendants "were going to go after anybody." RT 1106. After Juror No. 8 remained concerned that she did not want the defendants to "find out that [she was] saying these things" and she didn't want any attention, RT 1106, the trial judge made sure Juror No. 8 could leave chambers unobserved by the defendants. *See* RT 1110-11. Through words and deeds, the trial judge may have implictly conveyed that the defendants were dangerous individuals.

On this record, the prosecution did not meet its heavy burden to show that Juror No. 8's observation of Mr. Rodriguez's menacing behavior was harmless to Ms. Boode. Rather than explain why the incident was harmless, the prosecutor suggested that the court could keep Juror No. 8 on the jury and "re-address the issue later on. We don't lose anything by dismissing her at the conclusion of the case." RT 1113. The court rejected that proposal because, although the juror was afraid, "she didn't say she couldn't be . . . fair and impartial." RT 1113. Applying the *Remmer* presumption, this Court concludes that juror misconduct has been shown and the prosecution did not meet its heavy burden to rebut the presumption and show the incident to be harmless to the defense.

### iv.    The Error Was Harmless Under *Brecht*

In a federal habeas action, the receipt of extrinsic evidence or extraneous information by jurors is "generally subject to a 'harmless error' analysis, namely, whether the error had [a] 'substantial and injurious' effect or influence in determining the jury's verdict." *Estrada v. Scribner*, 512 F.3d 1227, 1235 (9th Cir. 2008); *see Brecht v. Abrahamson*, 507 U.S. 619, 638

United States District Court
For the Northern District of California

1   (1993)).  Although the *Remmer* presumption and the *Brecht* test do not fit together comfortably, both

2   must be applied.  *See generally Barnes v. Joyner*, 751 F.3d 229, 252-53 (4th Cir. 2014) (remanding

3   to district court for application of *Brecht* test, after concluding that the state court's adjudication of

4   the juror misconduct claim was an unreasonable application of *Remmer*).[6]  The *Remmer* presumption

5   applies to determine whether there was juror misconduct (including whether the juror was

6   prejudiced) amounting to a constitutional violation; *Brecht* applies to determine whether such

7   constitutional violation was harmless to the petitioner.  When the court applies the *Brecht* test, the

8   petitioner is "not entitled to the *Remmer* presumption in attempting to to make this [*Brecht*] showing

9   because the presumption does not apply in the federal habeas context when proving a substantial and

10  injurious effect or influence *on the jury's verdict*. [Citations.] Therefore, to be entitled to habeas

11  relief, [the petitioner] will need to affirmatively prove actual prejudice by demonstrating that the

12  jury's verdict was tainted by the extraneous communication."  *Barnes*, 751 F.3d at 252-53 (emphasis

13  added).

14          In the case at bar, habeas relief is not available on the juror misconduct claim, because Ms.

15  Boode has not shown that the constitutional error had a substantial and injurious effect or influence

16  on the jury's verdict.  First, Mr. Rodriguez's staring at and mouthing words at the witness was quite

17  consistent with the witness' testimony about Mr. Rodriguez.  *See generally Henry v. Ryan*, 720 F.3d

18  ─────────────────

19          [6] The Ninth Circuit's cases on juror misconduct have taken several different approaches, with
    none of those cases actually holding that both *Remmer* and *Brecht* tests should be applied or that one
20  test should be used to the exclusion of the other.  *Compare Smith v. Swarthout*, 742 F.3d 885, 894
    (9th Cir. 2014) (not mentioning *Remmer*, *Mattox* or any presumption of prejudice;  "[o]n collateral
21  review, trial errors—such as extraneous information that was considered by the jury—are generally
    subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious'
22  effect or influence in determining the jury's verdict."), *and Estrada*, 512 F.3d at 1235, 1238
    (applying *Brecht* test to evaluate the consideration of extraneous information by the jury), *with
23  Caliendo v. Warden of California Men's Colony*, 365 F.3d 691, 697, 699 (2004) (reversing with
    directions to grant relief after concluding that state court's failure to presume prejudice under
24  the *Remmer/Mattox* rule was contrary to clearly established federal law), *and Xiong v. Felker*, 681
    F.3d 1067, 1076 (9th Cir. 2012) (identifying the *Remmer* presumption as part of the juror
25  misconduct rule and finding no error), *with Fields v. Brown*, 503 F.3d 755, 779-81 (9th Cir. 2007)
    (*en banc*) (pre-AEDPA case, mentioning the *Remmer/Mattox* rule and declining to decide whether
26  the event (a juror's use of a Bible to make a list of pros and cons, with Biblical passages as support)
    was juror misconduct because it was harmless under the *Brecht* standard).  By applying both the
27  *Remmer* presumption and the *Brecht* test, this Court follows both the spirit of § 2254(d)(1), which
    requires the Court to look to Supreme Court precedent to identify the "clearly established law" by
28  which to evaluate a habeas claim, and the purpose of *Brecht*, which limits habeas relief only to those
    constitutional errors that have an actual and injurious effect on the jury's verdict.

United States District Court
For the Northern District of California

1073, 1085 (9th Cir. 2013) (denying certificate of appealability for claim of juror misconduct based on experiment done by two jurors because he could not satisfy the *Brecht* test; "extraneous information is less likely to be prejudicial when, as in this case, it 'merely confirmed what any reasonable juror already knew'"); *cf. Drayden v. White*, 232 F.3d 704, 710-11 (9th Cir. 2000) (even if trial court erred in instructing jury that it could consider petitioner's in-court outburst, the error was not prejudicial because, among other things, "it is unlikely that the outburst prejudiced Petitioner by causing the jurors to think less of him than they did before the outburst").  As the court and prosecutor suggested at the hearing, some of Juror No. 8's distress may have been as much due to the testimony at trial about the murders, gangs, and threats against witnesses as Mr. Rodriguez's in-court behavior.  *See* RT 1104, 1113.  The recipient of the glaring and mouthing of words was Mr. Elisary, who testified, among other things: (1) both Ms. Boode and Mr. Rodriguez were in criminal street gangs, and Mr. Rodriguez was one of the leaders in his gang, RT 721-724; (2) Ms. Boode, Mr. Rodriguez and Mr. Elisary planned in advance that Ms. Boode (who was carrying a .357 revolver) would demand the money and Mr. Rodriguez would "be the muscle," RT 745, 760-61; (3) Ms. Boode told Mr. Elisary that she shot the husband in the back and chased the wife into the bedroom where she shot her in the neck or facial areas, RT 772-75; (4) Mr. Rodriguez said that he choked the husband with a string or cord until he couldn't hear him any more, RT 776, and that Mr. Rodriguez had cleaned and placed the .357 revolver and a casing near a victim to try to make the killings look like a murder-suicide, RT 780; (5) after the killings, Ms. Boode decided that they should tell the police that they left when the victims were arguing, to support the murder-suicide story, RT 781; (6) after the killings, Mr. Rodriguez told Mr. Elisary to "keep [his] mouth shut" and threatened to hurt Mr. Elisary and his family, RT 785; (7) Mr. Rodriguez made another implicit threat to Mr. Elisary's family after Mr. Elisary testified at the preliminary hearing, RT 786-87; and (8) Mr. Elisary felt that his life was in danger in prison from any inmate as a result of testifying, RT 799-800.

Second, the incident occurred on the eleventh or twelfth day of a 21-day trial, long before jury deliberations began.  There was substantial evidence of guilt.  Numerous witnesses incriminated Ms. Boode along with the other defendant.

1   Third, Juror No. 8 was exposed to the external influence for a very short amount of time; in

2   fact, neither the court nor counsel even noticed the incident that had taken place in open court.  *See*

3   *generally Henry*, 720 F.3d at 1086 ("The Supreme Court, for instance, has found juror misconduct to

4   warrant reversal in cases involving *extended* external influences on jurors or confirmed juror *bias* –

5   neither of which is present here").

6   Fourth, Juror No. 8 confirmed to the court that she had not discussed the matter with any

7   other juror, and was instructed not to discuss the matter with other jurors.  RT 1104.

8   Fifth, the jury deliberated only two hours before returning a verdict, suggesting this was not a

9   close case.  *See United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007) ("'Longer jury

10  deliberations weigh against a finding of harmless error because lengthy deliberations suggest a

11  difficult case.'").

12  Ms. Boode has not shown that the error in not dismissing Juror No. 8 had a "substantial and

13  injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637.  Ms. Boode

14  therefore is not entitled to federal habeas relief on her juror misconduct claim.

15  b.   Juror Bias Argument

16  The presence of an actually biased juror would violate the Sixth Amendment's right to an

17  impartial jury and would support habeas relief.  Actual bias in a juror has been defined as "'the

18  existence of a state of mind that leads to an inference that the person will not act with entire

19  impartiality.'  Actual bias is typically found when a prospective juror states that he can not be

20  impartial, or expresses a view adverse to one party's position and responds equivocally as to whether

21  he could be fair and impartial despite that view." *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007)

22  (en banc) (citations omitted) (rejecting claim of actual bias in juror who said he put aside the fact

23  that his wife was the victim of a similar assault and represented that he was impartial).  "It is

24  sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a verdict based

25  on the evidence presented in court." *Irvin v. Dodd*, 366 U.S. 717, 723 (1961) (defendant was denied

26  a trial by an impartial jury as a result of extensive adverse pretrial publicity).  Implied bias (e.g., bias

27  that may be presumed from a juror who repeatedly lies during voir dire or a juror who is closely

28  related to a litigant) would not support habeas relief because the "Supreme Court has never

26

United States District Court

For the Northern District of California

1    explicitly adopted or rejected the doctrine of implied bias." *See Hedlund*, 750 F.3d at 808.  Unlike

2    juror misconduct, the presence of an actually biased juror is structural error, requiring a new trial

3    without a need to show prejudice under *Brecht*.  *See Smith v. Swarthout*, 742 F.3d 885, 892 n.2 (9th

4    Cir. 2014).

5         Juror No. 8 was frightened by seeing Mr. Rodriguez glare at and mouth words to the

6    testifying witness but stated on the record that she could set aside what she had observed and keep

7    an open mind.  She also confirmed that she could "decide the facts" and affirmed that she could vote

8    "not guilty" if the prosecution did not prove its case.  *See* RT 1108-09.  Although Juror No. 8

9    appeared tentative in her wording – saying things such as "I think so" rather than "I absolutely

10   could" when asked if she could "keep an open mind, and for both sides?" – her inflection, tone and

11   demeanor are the sort of factors that go into the trial judge's determination of her impartiality and

12   are presumptively correct in a federal habeas proceeding.  *See Hedlund*, 750 F.3d at 807 (in a § 2254

13   proceeding, the state trial judge's findings regarding juror bias or misconduct are "'presumptively

14   correct' and cannot be overcome without clear and convincing evidence"); *cf. Skilling v. United

15   States*, 561 U.S. 358, 395-96 (2010) (in reviewing claims that the trial court failed to dismiss a juror

16   for actual bias during voir dire, "the deference due to district courts is at its pinnacle").  The

17   presumption of correctness under *Hedlund* and 28 U.S.C. § 2254(e)(1) in the trial court's implicit

18   determination that Juror No. 8 was not actually biased has not been overcome by Ms. Boode.[7]  It was

19   not an unreasonable application of Supreme Court precedent for the California Court of Appeal to

20   conclude that Ms. Boode had not shown actual bias by Juror No. 8, especially in light of Juror No.

21   8's affirmative representations that she would try to do her duty and thought she could judge the

22   facts fairly.

23        Ms. Boode cannot obtain relief on her claim that she was denied a trial by an impartial jury

24   because she has not met her burden to show that the California Court of Appeal's rejection of her

25   _____

26        [7] For the juror misconduct analysis, no § 2254(e)(1) deference was given to the state court
     factual findings because an incorrect legal framework was used by the state court in evaluating the
27   juror misconduct claim.  In evaluating the juror bias claim, the state court did not apply an incorrect
     legal framework and thus this Court is not free from the constraints of § 2254(e)(1) on the juror bias
28   claim.

United States District Court

For the Northern District of California

1  jury misconduct claim "was so lacking in justification that there was an error well understood and

2  comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v.*

3  *Richter*, 562 U.S. at 103 (discussing the very restrictive nature of § 2254(d)).

4  C.     Failure to Query Other Jurors About Mr. Rodriguez's Behavior

5         At the hearing at which Juror No. 8 informed the trial court of her concerns about seeing Mr.

6  Rodriguez glaring and mouthing words to a witness, she said she had not discussed the matter with

7  other jurors.  RT 1104.  When defense counsel moved for a mistrial "because the jury pool now is

8  tainted by Juror No. 8's emotional status and by her fear of continuing in the jury," the trial court

9  denied the motion, noting that Juror No. 8 had not done anything and had said she did not discuss

10 the matter with the other jurors.  RT 1114.  Ms. Boode now claims that her right to an impartial jury

11 was violated by the trial court's failure to inquire whether other jurors saw the same incident of her

12 codefendant glaring at and mouthing words to the testifying witness, and whether any of them were

13 affected by such behavior.  Docket # 1 at 6.

14        The California Court of Appeal rejected Ms. Boode's claim, explaining that Juror No. 8 had

15 indicated "that she had not discussed the matter with any other juror.  Examining each juror

16 individually, therefore, would have drawn unnecessary attention to Rodriguez's behavior, and

17 possibly given rise to a claim that such inquiry prejudiced the panel."  Cal. Ct. App. Opinion at 11.

18 The state appellate court also noted that, even if other jurors observed the threatening gestures, there

19 was no reason to assume any juror was so upset that he or she could not be able to perform his or her

20 duties as a juror.  *Id.*  None came forward to express the concerns voice by Juror No. 8.  It was not

21 an abuse of discretion for the trial court to "tak[e] a 'wait and see' approach concerning whether any

22 juror other than Juror [No. 8] might have been affected" by Rodriguez's courtroom behavior.  We

23 conclude that the scope of questioning into the possibility of juror bias in this case fell well within

24 the proper exercise of the court's discretion.  No further inquiry was required."  Cal. Ct. App.

25 Opinion at 11-12 (second alteration in source).

26        The California Court of Appeal's rejection of this claim was not contrary to or an

27 unreasonable application of clearly established Supreme Court precedent.  Although a hearing was

28 held for Juror No. 8, who had reported a concern about Mr. Rodriguez's behavior in court, the

**United States District Court**
For the Northern District of California

1  Supreme Court has never clearly established that all jurors must be questioned whenever an

2  extraneous influence has been observed by one of them.  The Supreme Court "has not yet decided

3  whether due process requires a trial court to hold a hearing *sua sponte* whenever evidence of juror

4  bias comes to light." *Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005); *see, e.g., id.* (trial court

5  declined to hold a hearing to investigate the matter after jurors sent two notes expressing concern

6  that defendant  was looking at their personal information in the jury questionnaires and was taking

7  notes on them; habeas relief not available due to lack of Supreme Court precedent requiring a

8  hearing to investigate possible juror bias); *Grotemeyer v. Hickman*, 393 F.3d 871, 880-81 (9th Cir

9  2004) (*Remmer* did not require an evidentiary hearing without evidence showing the jurors

10  discussed potentially prejudicial extrajudicial information); *Tracey v. Palmateer*, 341 F.3d 1037,

11  1044 (9th Cir. 2003) ("*Remmer* and *Smith* do not stand for the proposition that *any time* evidence of

12  juror bias comes to light, due process requires the trial court to question the jurors alleged to have

13  bias."); *id.* (*Smith* and *Remmer* have been interpreted "as providing a flexible rule.").  Not only was

14  there no Supreme Court precedent requiring a hearing to question all the jurors about Mr.

15  Rodriguez's behavior, the California Court of Appeal reasonably concluded that the risk of such

16  questioning (possibly causing prejudice by alerting jurors to Mr. Rodriguez's alleged menacing

17  behavior that they otherwise hadn't seen and incidentally stressing its importance by querying them

18  about it) outweighed the potential benefit of finding out whether any other juror saw the incident that

19  appeared to cause no upset to any juror other than Juror No. 8.  There did not seem to be much doubt

20  that the incident had occurred – a court staff member also reported it – but the judge and attorneys

21  hadn't seen the incident and perhaps other jurors didn't either; those other jurors certainly would

22  have been made aware of it if questioned about it.  The key question was what impact it had on any

23  juror who had seen it, yet only Juror No. 8 reported being bothered by it. The trial court reasonably

24  concluded that other jurors did not need to be questioned about an incident that apparently had not

25  upset any of them if observed by any of them.  Due to the absence of clearly established Supreme

26  Court precedent on point, § 2254(d)(1) bars relief on the claim that the state trial court violated Ms.

27  Boode's constitutional rights by refusing to hold a hearing to determine whether any other juror saw

28  the incident and was affected by it.  Further, for the same reasons stated in the previous section, Ms.

1    Boode has failed to show that the failure to question other jurors about the incident had a

2    "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at

3    637. *See Sims*, 414 F.3d at 1152-53 (claim of failure to investigate alleged juror bias is not structural

4    error).

5    D.      Eighth Amendment Claim Regarding The Sentence

6            "To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class

7    of persons eligible for the death penalty and must reasonably justify the imposition of a more severe

8    sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484

9    U.S. 231, 244 (1988) (citation omitted).  This narrowing function can be achieved by either laws that

10   "narrow the definition of capital offenses" or laws that "more broadly define capital offenses and

11   provide for narrowing by jury findings of aggravating circumstances at the penalty phase." *Id.* at

12   246.

13           Ms. Boode argues that the foregoing narrowing principle from Eighth Amendment death

14   penalty jurisprudence should be applied in the context of sentences of life imprisonment without the

15   possibility of parole ("LWOP").  Ms. Boode argues that her LWOP sentence violates the Eighth

16   Amendment because "there was no meaningful basis for [the] jury to distinguish the factual findings

17   necessary to return a verdict of first degree robbery felony murder" from the factual findings

18   necessary to find true the robbery special circumstances allegation under § 190.2(a)(17).[8]  Docket #

19   1 at 8.  Her view is that § 190.2(a)(17) violates the Eighth Amendment because it does not narrow

20   the class of murderers eligible for the death penalty or LWOP sentences from the group of murderers

21   who otherwise will receive a sentence of 25 years to life.[9]

22

23           [8] Under California law, first degree murder is punishable by death, life imprisonment without

24   the possibility of parole, or 25 years to life in prison.  *See* Cal. Penal Code § 190(b).  If a defendant
     is found to have committed the first degree murder in the course of certain felonies, including

25   robbery, the punishment is death or life imprisonment without the possibility of parole.  *See* Cal.
     Penal Code § 190.2(a)(17).

26           [9] Ms. Boode noted in a state court brief that her entire Eighth Amendment argument about

27   the felony murder special circumstances finding under § 190.2(a)(17) is largely an academic point
     because "the jury also found 'true' a special circumstance allegation of 'multiple murders,'" which

28   is not covered by her challenge and therefore would support the LWOP sentence regardless of her
     challenge to § 190.2(a)(17).  Petition For Review at 22 n.6.

United States District Court

For the Northern District of California

1    The California Court of Appeal flatly rejected this argument because "the Eighth

2    Amendment's narrowing requirement has been found not to ly to life-without-parole sentences but

3    only to sentences of death."  Cal. Ct. App. Opinion at 19 (citing *Harmelin v. Michigan*, 501 U.S.

4    957, 995-96 (1991)).[10]

5    The California Court of Appeal's rejection of Ms. Boode's Eighth Amendment claim was not

6    contrary to or an unreasonable application of clearly established Federal law, as set forth by the U.S.

7    Supreme Court.  The narrowing principle applicable in the death penalty context has never been held

8    by the Supreme Court to apply to the non-death penalty context.  In fact, "the Supreme Court has

9    refused to extend this rule to require states to distinguish between criminals sentenced to LWOP and

10   those sentenced" to life with the possibility of parole or lesser sentences.  *Houston v. Roe*, 177 F.3d

11   901, 906 (9th Cir. 1999) (citing *Harmelin*, 501 U.S. at 995); *see also Bradway v. Cate*, 588 F.3d 990,

12   991 (9th Cir. 2009) (petitioner with LWOP sentence "recognizes that he lacks standing for an Eighth

13   Amendment death penalty challenge because he was not sentenced to death"); *cf. id.* at 992

14   (Supreme Court has not issued a holding regarding the failure to narrow the class of first degree

15   murderers to those properly eligible for an LWOP sentence); *id.* (Supreme Court also has not

16   decided any case "that could reasonably support [a] due process claim of unconstitutional vagueness

17   based on a failure to narrow the class subjected to more severe penalties").  Ms. Boode conceded in

18   state court that the narrowing principle has not been extended to LWOP sentences, and explained

19   that she was making the argument "to preserve it for federal review, if the United States Supreme

20   Court determines in [the] future that Penal Code [§ 190.2(a)] violates the Eighth Amendment."

21   Petition For Review at 26.

22   Due to the Supreme Court's refusal to extend the narrowing principle to the LWOP context,

23   the state court of appeal's failure to extend the principle to the LWOP context does not support relief

24   under § 2254(d)(1).  "Section 2254(d)(1) provides a remedy for instances in which a state court

---

26   [10] The California Court of Appeal also rejected the challenge for the additional reason that
     controlling California Supreme Court precedent had "'consistently rejected the claim that the
27   statutory special circumstances ... do not adequately narrow the class of persons subject to the death
     penalty,'" and specifically had held that the felony murder special circumstance in California Penal
28   Code § 190.2(a)(17) "is not overbroad and adequately narrows the pool of those eligible for death."
     Cal. Ct. App. Opinion at 19-20.

1 unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent

2 or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697,

3 1706 (2014) (in capital case, not objectively unreasonable for state court not to extend to penalty

4 phase constitutional rule that applies to guilt phase). Ms. Boode is not entitled to the writ on her

5 Eighth Amendment claim.

6 E.     A Certificate Of Appealability Will Issue As To Two Claims

7       Ms. Boode has "made a substantial showing of the denial of a constitutional right," 28 U.S.C.

8 § 2253(c)(2), and reasonable jurists would find debatable the district court's assessment of

9 petitioner's claims that (a) her right to due process was violated by the denial of a continuance and

10 (b) her right to be tried by an impartial jury was violated by the trial court's failure to dismiss Juror

11 No. 8. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability

12 is GRANTED on those claims. The certificate of appealability is DENIED as to all the other claims

13 in the petition. Ms. Boode is cautioned that the court's ruling on the certificate of appealability does

14 not relieve her of the obligation to file a timely notice of appeal if she wishes to appeal.

**VI.   CONCLUSION**

16       The petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the

17 file.

19       IT IS SO ORDERED.

21 Dated: May 1, 2015

23 EDWARD M. CHEN
   United States District Judge